Good morning, Your Honors. Good morning. My name is Colin Desetnik. I appear for the petitioners in the Nedelika and Lepidot Petitions for Review, and I would like to reserve three minutes for rebuttal. Very well. So, since you want to do three minutes for rebuttal, let's get right into this. I understand that in, and you tell me, Nedelika, is that the way you say it? Nedelika. Nedelika. Correct. Nedelika. Because I'm just a shy old yahoo, and I don't know how to say their names. So, Nedelika. It's my understanding you didn't raise a cat claim to the BIA, correct? And therefore, it's abandoned here? That's correct. It's abandoned. And I also understand that as to Nedelika's claim in past persecution, there's nothing in the opening brief, so that's waived. Correct. So, we're really then talking about Selaru's past persecution claim, and then we're going to talk about future persecution, his favorite group, that kind of stuff. So, Your Honors, I actually intend to focus and devote my argument to the well-founded fear of future persecution. I'm not conceding that there is no past persecution with regard to Selaru, but I'm happy to submit that on the briefs alone. I do feel the other issue is Before you do that, I do have a question. Yes. Mr. Selaru, is it my understanding that he, when he was about 11 years old, saw his mother being beaten in front of him? That's correct. Is that correct? Yes. And that was so devastating to him at that time, is that correct? That's correct. Excuse me, I don't mean to take away from my good colleague's question, but if that was so put into his mind that he worried about it, why is it that he didn't testify to that event? When he was testifying in front of the agency, he did not testify to that event. The only place we find that event is in the declaration. So, Your Honor, I was not the attorney at the trial court. I do believe that there was an inadequacy of counsel in regard to the testimony, and the record is very difficult. I believe that every statement of false prosecution made in the declaration ought to be articulated. Well, I understand that. It wasn't done by him. I read the case. What worried me, I guess, was I'm trying to understand exactly about this because I'm not sure that the petitioners raised the issue that the IJ needed to for either the incident in 1996 or 2000 before the BIA. I'm not sure that came up before the BIA. It wasn't mentioned regarding the 2000 incident. It was only stated the age regarding the 95 incident, but not argued that the IJ failed to consider the perception as a child. So the BIA didn't have that really focused in front of them, and I have a standard of review to give to that BIA decision. And so if they don't even raise it or really talk about it, how can I really focus in on that it is? And I have to, in this particular suggestion, say there's no substantial evidence to sustain it. I understand, Your Honor, and because it was not attested to in the verbal, oral testimony, it was not focused on for purposes of the appeal. So I guess I do have a question. Let's just assume that putting that information in your petition and as part of the declaration should be considered by the IJ and the BIA. Let's just assume that for a second. And the fact that it was not then discussed by the BIA under Hernandez-Ortiz v. Gonzalez, would that be an error? Your Honor, I would submit it's an error, but I do also note that the IJ claimed that she had considered all the testimony. And all of the affidavits and everything that was in front of her, right? Assuming that that broad statement of hers covers everything, including the exhibits. It was a lecture basis for claiming theirs, but the BIA ignored the possibility of future persecution. So that is my address to the Court today, Your Honor, this morning. The petitioners in both appeals urge this Court to grant the petition for review because the evidence in each case compels the conclusion that they have a well-founded fear of a 10% or greater likelihood of future persecution if returned to Romania. I have three points to make, three submissions to make in this regard. The first one is that the record evidence compels the conclusion that the Romans should be considered a disfavored group in Romania. Well, if that's your first point, let me ask you a question about that. What is my standard of review in considering that question? Substantial evidence. So I read what they said about that. I can't really say there's no substantial evidence to sustain what they said because substantial evidence is hardly any evidence. And if you just read what they say, there's enough evidence there to do substantial evidence. So how do we get there? So, Your Honor, they relied on the European Union's proposal. But that's just an argument about the substantial evidence they relied upon is not good enough. But if there is substantial evidence, me being over the top of this BIA decision, I have to give them deference. I have to say it compels a conclusion opposite, that there is no evidence to sustain what they said. That's not there. So, Your Honor, I'm aware of the standard. I'm saying that they relied on a portion of the report. If they had read the entire report, they would have seen that the report is not a substantiation for denying the disfavored group assessment. In fact, they talk about the efforts by the EU. But is there any proof that those efforts have resulted in anything other than continued persecution of the Roma? Exactly, Your Honor, that the EU report itself claims that it has been largely ineffective and that it has not been able to introduce reforms that have had any impact. And they don't expect it to have an impact for at least a generation. And these petitioners are looking at being returned to Romania imminently, not a generation or two later. If I assume a disfavored group? Yes. And at that point, does this record compel a conclusion that the petitioner has an individual risk of being singled out? I mean, he only suffered two isolated events, 10 years apart and over 10 years ago. So it depends on how the court views those events. Were they isolated, as the BIA claims, or were they, in fact, very indicative of the underlying reality that they were based on ethnic, on the Roma identity? But if I read what the BIA and what we've said before in LAPRI, the arguments ignore that discrimination and harassment by themselves do not raise to the level of persecution. And the disfavored group analysis does not alter the qualitative standard of proof that you must have over and above that. And that's why I focused in on there's only two events. Your Honor, both of those events are related because... Well, they may be related, but they're not really persecution. I mean, the fact that they're discrimination, I'll give it to you. But that they are really persecution, based on what we have determined are persecution? Your Honor, LAPRI says that you do not have to rely on past mistreatments to rise to the level of persecution. They just have to show individual targeting. In both instances, the Savaru was targeted because of his Roma ethnicity. But the fact is, even if I give you that there's a disfavored group, which you continue to argue, it seems to me that you have to come up with a qualitative standard of proof. So I looked at the times, what he suffered at those times. For instance, the last time the respondent spoke of any problems that he had in Romania, it was in 2012. Even though the police were involved, he was only given a ticket, and he wasn't physically harmed. If I look at the one before, not a situation. This is when he was driving. He was stalked. I guess I'm trying to figure out if it rises to the same, and I don't think it does. So, Your Honor, I would submit that second instance where he's stalked. He's stalked because he's a Roma. He's darker. He's easily identifiable. He is then mistreated to the point where... Are we referring to when he was 15? Is that the one? No. The latter one? Not when he was being at 15? We're talking when he was 25. Oh, I see. He's stalked because he's a Roma. He's thrown onto the asphalt. He's mistreated. He's taken to the station. He's beaten, and no charges are ever laid against him. So, it's pure ethnic abuse and mistreatment. It might not in and of itself rise to the level of persecution, but WACK resets. There's no need for it to do so. You can refer back to any past mistreatment where there was targeting. The idea of finding a disfavored group is not simply to say they're disfavored, but to say the extent to which they're disfavored. The extent is so pervasive, so overwhelming. These are people who were second to the Jews in the Holocaust. These are people who, you know, their suffering in Romania is very widespread. Council, did you want to save the Romania of your time? Yes. I'd like to know, though, quickly, what are your ideas? You said there were three grounds. The first was the disfavored group. So, the first ground is the disfavored group, and I would argue that if you look at the very record of the EU, the EU says that their plight goes way beyond discrimination. They are subject to hate crimes. They are subject to hate speech. I understand, but what were your other two? So, once the court determines that there's disfavored status, it needs to quantify that and say this disfavored status is not just basically qualifying. It is overwhelming, and once it's overwhelming, the amount of individual targeting can be very limited on the part of Solaru and the delegates in order to qualify. And you said when you started there were three grounds. Yes, there were three submissions. The first submission was just to satisfy the court that there is disfavored group status and that the second submission was that the agency had no right to rely on the EU report in order to deny and then applying the disfavored group status now that it's established has been overwhelming. One need only show a minimal amount of individual targeting, which does not have to rise to the level of persecution, but needs to have targeting that's a mistreatment and added to the existing overwhelming prejudice that he suffers by virtue of being a Roma. He meets the standard of reasonable fear of future persecution. What authority do you have for the idea that we three can decide that being a Roma is a disfavored group? Because in my view, as you've already suggested, this is substantial evidence review. I can only overturn it as a compelling conclusion. So I don't have any authority to suggest that I can decide this is a disfavored group. If I want to have the BIA think about a disfavored group, I need to send that back to them, don't I? I can't do that myself. I would have to send it back on that issue, wouldn't I? So, Your Honor, I do want to say as a practitioner in this field, when I'm coming before the lower courts, they need guidance on whether Roma are disfavored. The problem is I don't have any authority in the Ninth Circuit which suggests that a group of three of us can determine what a disfavored group is. It's always the BIA who determines it and we decide if they're wrong. So, Your Honor, I would say in this case that a remand to the BIA would be appropriate to determine because the BIA never applied itself to whether they had a disfavored group. The BIA simply said the judge in the court below had determined that there's no need to go into the disfavored group and then they said that even if it is a disfavored group, this is how we'll deal with it. But I think that the law requires that the Roma be characterized as having the status of a disfavored group and the law needs to bring this about whether it's this court that doesn't necessarily have the ability or the BIA. I just wanted some authority for me to do that. I just don't want to do something I have no authority to do. Well, Your Honor, given, I would say this court does have the authority because the BIA But the case says that. Okay, but the BIA never made a decision that never addressed the issue of whether they disfavored. They just assumed that they could go to the next step of saying, and assuming they disfavored, then was left in the Ninth Circuit. They just remanded back to the BIA for a determination. Yes. All right. I think your time is up. Why don't you, I'll give you a couple of minutes afterwards. Thank you, Your Honor. All right. Thank you. Good morning. Jonathan Weedle, Department of Justice, on behalf of the respondent. May it please the Court, we submit that the agency properly denied the petitioner's applications based on determination that they did not experience past persecution. Let me stop you here. With regards to Lapidate, that case, if I remember correctly, is it my understanding that the shooting was characterized, why didn't you characterize the shooting as an attempted murder or attempted homicide of some sort? Correct. I think that is how the petitioner, or how Mr. Lapidate was characterized in his submissions. However, the evidence that was submitted to the agency regarding that incident was rather vague as to the circumstances, and to call it attempted murder, I think that signifies that we have more information. I want to talk about the shooting here for a second because Mr. Lapidate talked about the shooting, and the BIA didn't address the shooting, is that right? They did not specifically mention the shooting. Well, that's kind of a big thing, right? Someone being shot at and then called a gypsy. Well, we submit that the Board did not have to specifically address it in their decision, but what the Board did was refer to, cite to the portions of the immigration judge's oral decision, which does discuss the shooting. The IJ characterized the shooting as, in 2007, he was physically harmed in a sense that he was shot at by an individual for trespassing into property. Isn't that a bit of a mischaracterization, don't you think? I think that's a fair characterization of what the testimony was, where the petitioner or Mr. Lapidate admitted that he had been trespassing on someone else's property. Well, it wasn't someone else's property. He testified credibly, according to the IJ, that he was on public land, correct? I think there's some conflicting information in the record about public or private. But he testified credibly that that's what happened, correct? Correct. All right. And then he identified the individual who shot him, correct? His name was Miguel, correct? I think he referred to him as a ranger. No, he gave his name. He gave his name to Miguel, and then he gave his last name. But because of the translation, we don't have that. It was, for whatever reason, taken out. But he gave his full name, correct? I would have to go back and look at the transcript. But I would assume that that's the case if that's supported by the record. Then he was taken to the hospital, correct? Correct. And then at the hospital, instead of being treated, he was then taken by the police officers because they called the police on him, correct? That's correct, yes. And then he was taken to that police station, and at the police station he was threatened that he was going to be harmed, wasn't he? That's correct, yes. If he talked about this because they recognized Miguel, the person, the ranger, the other law enforcement officer who had shot him, correct? Well, I'm not sure there's clear evidence in the record that this was another law enforcement officer who shot the petitioner. In fact, there's no evidence in the BIA record, there's no evidence anyplace that the other person was a government official. The best we have is that the police didn't do anything about it because he was their friend. Isn't that the evidence? That is the evidence. That is what the petitioner testified to. There's no indication that Mr. Lapidot knew the assailant or that they had any prior dealings, which is why the immigration judge reasonably characterized it as an isolated incident that arose from specific circumstances. The petitioner was at home. Did I misunderstand the record in that he testified that it was a law enforcement officer? It's not clear. I think he uses the word ranger. Does ranger refer to only a person? I don't think that testimony was developed before the immigration judge. So let's assume that ranger means what one would normally think of a ranger would be a law enforcement officer, and he testified credibly. Why can't we assume that that was a law enforcement officer because he said ranger? Well, the evidence might support that interpretation, but, again, on substantial evidence review, you have to look at whether the record compels the conclusion that this was a law enforcement officer. That's how he characterized it. He was then taken to the police, right? That's correct. And then he was told, don't talk about this, correct? And then he tried to go back to the hospital, and he went back to the hospital. He really said, you're not going to die from this, and they sent him off. Is that correct? That's correct. And this is not to minimize the seriousness of this incident. It's obviously very huge. He was shot in the back, wasn't he? That is also not entirely clear. He spoke about it in his written testimony, in his declaration. He wasn't clear as to whether or how he was injured. He testified that he had his back toward them when he was shot. Right. He initially said that it was one shot that was fired. Then shortly thereafter, he said in his testimony that he wasn't sure how many shots were fired. Right, but he said that he was shot when he was turned around, when he had his back toward them. He testified that he was hit by shrapnel, and that there was shrapnel that was still lodged in his back. Four pieces, correct? I don't specifically recall. Let's assume that that's what the record reflects. Four pieces, correct? That are still stuck in his body from the shrapnel he received from being shot at, and the BIA didn't refer to this in their opinion, did they? It was not specifically discussed, but, again, the BIA does not have an obligation to identify each incident or part of it. They suggest this was an isolated incident. That's what the immigration judge explicitly said, that it was an isolated incident. I have to look at the immigration judge's decision as well as the BIA's decision in making this determination. Right, and that would be the scope of this court's review, because this was in 2007, though, right? But in 2011, he was slapped by the police twice, and that this would happen sometimes by another officer. His name is Chocolo, correct? 2011. That's correct. Okay, and then there was another incident in 2012 where his daughters were almost kidnapped, correct? Correct. And his mother sustained injuries. Specifically, she was cut in the back. Is that correct? I think it may have been hand injuries. No, that's what the IJ put in his record, but when you look at the declarations by both daughters and by the petitioner, the petitioner in that case, she testified in that declaration that she was cut in the back. Didn't she? Isn't that what the record said?  That mischaracterization of the record by the IJ and then the BIA, would that be also another basis? I don't think it would overcome the agency's analysis of the cumulative effect of the alleged incidents of harm that didn't reflect the type of sustained, repeated, targeted, escalating incidents of harm. Well, they didn't receive any health care. They testified that they had problems obtaining prompt health care, and to be specific, the appendix situation, correct? With regard to the appendix situation, I think that Mr. Lapidot's testimony was not entirely clear as to why he was not treated a certain way when he went. Well, he talked to people who had their appendix out, and having to wait two days with the pain of having their appendix out is quite excruciating, I imagine. So he had to wait two days because he wasn't getting health care for those two days, correct? Correct. I believe a fair reading of the record is that this was speculation on the part of Mr. Lapidot. Well, let's talk about something that was not speculation. According to the record, he indicated that he was beaten when he was trying to access the swimming pools, correct? That's correct. And he couldn't secure regular employment. He had to go to his relatives and other ROMA folks, is that correct? That's correct. And because ROMA can't get credentials to be employed, correct? I'm not sure if that was the specific impediment towards obtaining employment, but the petitioner did testify as to difficulties securing a job. He did mention this incident that took place in 2015 at the pool. There's no evidence that he sustained any serious injury as a result or any significant lasting injury. And, again, but are we looking at it as a cumulative, the shooting, the beatings, the not being able to obtain employment, aren't we supposed to look at the cumulative effect? Correct. And the agency did fulfill its obligation to look at these incidents cumulatively, and it found that it reasonably found that these incidents were isolated. The petitioner himself was not being specifically targeted by someone who harbored a specific animus. Am I right? Is it Lapidat's wife, Simona, that herself and the daughter attempted abduction and rape in 2012? That's correct, yes. I know. The BIA, what did the BIA say about that? Is that just another isolated incident? Yes, I'm looking at page two of the board's decision, where it does describe the incidents according to Mr. Lapidat's testimony and his wife's testimony. That's just part of the recitation of the factual basis for their asylum claim. But the board goes on to defer to the immigration judge's analysis of whether these incidents constitute past persecution. And so the board, in that sense, went above and beyond what it needed to do. It did specifically refer to the portions of the IJ's decision that discuss what happened to Mr. Lapidat's wife and refer to the specific portions of the hearing transcript where she testified regarding that incident. And, again, this was a cumulative analysis based on the severity of the harm and the other factors that this court has recognized as relevant to whether the record compels a finding of past persecution. As I understand, and I'm just trying to put this in perspective, as I understand the petitioner's claims are they lived in segregated areas where ROMA lived. They were unwelcome and unable to live outside of those ROMA population centers. They were excluded from formal employment market. There was an exclusion from healthcare in 2005, which my colleague has mentioned. There was a shot by someone, a forest man, maybe a ranger, but nobody ever says it's a government official until now. In 2011, he was kicked by a policeman. In 2012, there were victims of an attempted kidnapping and then a threatened rape of his daughters. And then in 2013, he left for France. And he stayed in France until 2015. And then what is it, how does the fact that he left and went to France and now he comes back to France, how does that voluntary return affect his claim for past or future persecution? Well, it certainly undermines the claim that he has a well-founded fear of persecution. If he relocated from Romania after all these harrowing incidents took place, and he went to France and returned to Romania voluntarily, that certainly undermines the well-founded fear portion of that. How does it affect the claim about past persecution? Well, I think it goes to the totality of the circumstances of what exactly transpired here. Is the harm that he encountered, was it sufficiently serious as to rise to the level of persecution? And here we have a few isolated incidents that occurred. Again, not to minimize the gravity of the situation, but these are several isolated incidents that occurred over a period of several years. They didn't involve any significant or lasting physical injury. And here you have the petitioner leaving his home country and voluntarily returning two years later. That definitely cuts against looking at the record and saying that it compels a finding of past persecution. Well, and then after he got back from France, it seems to me that the only thing we have in the record was he was beaten when he attempted to access the pool. That's correct. And I think it's unclear from the testimony, but he does refer to this officer, Chocolo, who apparently was targeting people of Burma ethnicity indiscriminately. That's who he was targeting. There was no specific animus towards Mr. Lapidot. So if, in fact, we are unclear about what happens with this shot, and there's thoughts that it might be a private individual, though he's called a ranger, never, ever argue that he's a government person before the BIA and not even in the briefs here. Should I send this back to make a further determination as to what really happened in this particular case before determining about past persecution? Your Honor, there would be no need to send the case back on that basis because the issue was given reasoned and thorough consideration by the immigration judge and then on appeal to the board. There is a strong presumption that the agency reviews all the evidence that's before it, and there's nothing to indicate that the agency completely dismissed the petitioner's arguments regarding this incident or otherwise mischaracterized the record. The record does reflect this was an isolated incident perpetrated by someone who the petitioner did not know. They did not know each other before it happened. There's ambiguities in the record as to the extent of the petitioner's injuries, whether he has any lasting injuries, any shrapnel that remains lodged in his back. He said that he submitted medical records to the immigration court reflecting the shrapnel wounds, but later on in his hearing, his attorney at the time conceded that the records did not contain that information. Let me, before you sit down, I didn't get a chance to talk to you about Mr. Salaru and the issues that he faced. Our precedent establishes that injuries to a family must be considered as an asylum case, where the events that formed the basis of the past persecution claim were perceived when the petitioner was a child. I know there's been some discussion about things not being argued, but did they include that information in the declarations that were submitted as part of the petition? The declaration from Mr. Salaru referred briefly to this incident that took place that he apparently witnessed. Well, but here's my question. I thought that the IHA referenced that in their opinion and said that in this particular instance and that when he was a child, they failed to get medical assistance. I believe that's how it's referenced without mentioning the fact that, of course, she was beaten in front of him. Right, and that was, the IHA did refer to that part of the declaration. There was not an extended discussion of whether the fact that the petitioner was a minor at the time of the incident, whether that itself is relevant to the persecution analysis. Well, you would concede that according to our precedent, that's relevant to the persecution analysis, correct? It is, however, not as relevant, but according to Hernandez-Ortiz, must, is the word used, be considered. Well, the issue wasn't fairly raised before the immigration judge because the declaration is very vague and unspecific about what transpired. There was no mention of any lasting psychological harm that the petitioner experienced. I thought that the way he described it was, what was the word used? Something like critical, to a critical condition, I believe, or that he was irreconcilable or something like that. I thought that was his language. Understandably, that was not the language he used. Again, Your Honor, I'm sorry, I would have to look back at the declaration, but I will assume that's the character of the IHA. I'm pretty positive it's fairly close, and let's assume for a second that that was the case. What else was he supposed to say? As a child, he was that affected. Well, it's his burden to develop that argument and to provide an additional factual basis for why that incident contributes to his claim of past persecution. He decided to rest on his declaration. The declaration was unspecific. He was cross-examined. That incident did not come up during cross-examination. There was redirect. The incident did not come up during redirect. And it's apparent from the IJA's decision that the declaration was considered and the allegations regarding what happened to his mother were considered by the agency and that there really was no additional factual development of his argument that would necessitate a more extended discussion of that particular episode and how it bolstered his claim of persecution. Let me see if I could ask you the same question I asked him at the end. If I'm looking at a disfavored group and I have to determine if one is a disfavored group, does my court have any authority to make that determination or is that a BIA determination? Well, I think it's unclear whether there's precedent from this court as to the standard of review with regard to a disfavored group determination. We would argue that it's very differential, that at the very least it's substantial evidence. But the way this court has described the disfavored group analysis, this court has described it as a common sense evidentiary proposition. Generally. Generally. I thought that under our precedent, I think maybe I'm mispronouncing the word, but it's something like tempulbong, that there's a Christians in Indonesia where this issue was being addressed, held in that particular case, where the BIA erred in failing to apply a disfavored group analysis to the petitioner's withholding claim because the record compels a finding that Christians in Indonesia are in fact a disfavored group. So, I mean, I think there is precedent for us to do that, isn't there? I don't think in this context we would oppose the application of a substantial evidence standard of review. But, again, that's not necessary for the court to consider, given the weakness of the petitioner's claims regarding the individualized risk of persecution that they face. Ultimately, the disfavored group analysis, it's subsumed within the well-founded fear analysis. And if substantial evidence supports the absence of a well-founded fear, then that is sufficient to uphold what the agency did. Let me ask if there are any questions, any other questions. All right. Thank you very much for your presentation. Thank you. In your rebuttal, I'd like you first to directly address, what about the fact that Lapidate came back from France to relocate into Romania, and the point of the government that that tends to show is past persecution claim must not be that strong. What do you say to that? So he came back temporarily and came to the United States not very much later, Your Honour. It's common among the Roma who experience leaving Romania, going into Europe, and finding that they are discriminated against in Europe generally to return to Romania to use their family support to gain enough money to return. When did he come? I don't know the date, Your Honour. I apologize. I think he was in Romania quite a while. And again, they're there until they can obtain enough funds to leave. But I think that he indicated he was destitute in France. I believe that's on the record. And so he returned as someone who may have had ambition to remain out of Romania, but found that he had a family obligation and he needed the support of his family, but he left subsequently. And if he hadn't left, I believe it would be correct, but he left meaning that he put it on hold, he put his fear in the context that he could take the risk of returning for a limited period. You don't know how long that period was? I apologize to the Court. I don't have that available. I'm happy to indicate that it would be on the I-589, the date that he entered the United States. I don't have it in my head.  We can take the record on that. Yes, I do want to say, Your Honour, that on the issue of Lafayette and the question of him being shot at, whether it was a government official or not, and probably it was because the police were ready to protect that individual. But the fact that the police will not accept complaints from Roma is widespread. They feel, the Roma, that they do not have protection of law. They feel that that is the underlying reason that they cannot stand up for themselves. They cannot get justice. And I would submit this is a classic case of a person being shot at purely because he's a Roma, because he was already leaving the premises. He had already apologized. He was already out the... He wasn't being shot because he was a trespasser anymore. He could have been shot without a communication between the two of them. The communication had taken place. The ranger had seen that he was a Roma, and when he left and when he no longer constituted any kind of threat, he was shot at. That is the... And he apologized the other time. Correct. A slur was involved and an identification was made. And then when he seeks police assistance, it's not given. And, in fact, he's threatened that if he pursues this, it will redound to his prejudice. This is a classic situation. All right. Thank you for your presentation. I appreciate the arguments of counsel on both sides. The matter of Nadelika et al. versus Garland and Lapidat et al. versus Garland, both matters will be submitted. Thank you very much today. And we will be in recess. Thank you, counsel, for your good arguments. All rise. This court for this session is in recess.
judges: Gilman, SMITH, MENDOZA